## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**SARAH C. WALTERS**

**CIVIL ACTION**

**VERSUS**

**NO. 23-277-JWD-SDJ**

**SHINTECH, INC. ET AL**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 24) filed by Defendants Shintech Louisiana, LLC, and Shintech, Inc. (collectively, "Defendants" or "Shintech"). Plaintiff Sarah C. Walters has filed *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Doc. 34) ("*Opposition*"), and Defendants have filed a *Reply Memorandum in Further Support of Defendants' Motion for Summary Judgment* (Doc. 37) ("*Reply*"). For the reasons stated below, the Court grants in part and denies in part the *Motion for Summary Judgment*.

## I.    BACKGROUND

Plaintiff filed suit in this Court on April 12, 2023, under Title VII of the Civil Rights Act and the Americans with Disabilities Act ("ADA"). (Doc. 1 at ¶ 1.) She alleges that while employed as a chemist at Shintech from August 20, 2018, until her resignation on July 4, 2022, she was harassed by her supervisor, Ric Boudreaux. (*Id.* at ¶¶ 10–12, 15, 75, 78.) She claims that Boudreaux's sexual harassment led to a hostile work environment, (*id.* at ¶¶ 78–81, 85), and that his refusal to transfer her to a day shift after she rejected his advances constituted quid pro quo harassment (*id.* at ¶¶ 82–84). Plaintiff alleges that she reported the harassment to Shintech's Human Resources Manager, Dana Coody, in March of 2020, but that Defendants failed to remedy the situation. (*Id.* at ¶¶ 34–35, 89.) As a result, Plaintiff alleges that she "had no choice but to resign from her employment[]" in July of 2022 and was therefore constructively discharged. (*id.* at ¶¶ 75,

1

135–137.) In addition to her sexual harassment claims, Plaintiff alleges that she was discriminated against on the basis of disability when Defendants repeatedly failed to make accommodations for her known disabilities, resulting in Plaintiff taking disability leave from October of 2021 through April 2022 and experiencing worsening medical conditions. (*Id.* at ¶¶ 91–92, 145–58.)

Defendants filed the pending *Motion to Dismiss* on May 10, 2024, (Doc. 24), and Plaintiff filed her *Opposition* on June 21, 2024, (Doc. 34). Defendants then filed their *Reply* on June 25, 2024. (Doc. 37.)

## II.    PARTIES' ARGUMENTS

### A.    Defendants' *Motion to Dismiss* (Doc. 24)

By way of context, Defendants argue that when Plaintiff was hired at Shintech on August 20, 2018, she had applied for and agreed to work shift work without ever expressing that she had been promised a day shift position. (Doc. 24-2 at 1–2.) They assert that Plaintiff had a friendly relationship with Boudreaux and never informed him that his discussion of personal or potentially sexual topics made her uncomfortable. (*Id.* at 3–5.) They argue that even when Plaintiff began to tell Boudreaux about her health concerns, she did not ask for an accommodation or request to work the day shift. (*Id.* at 5.)

Defendants acknowledge that when a day shift position opened, Boudreaux initially placed a contractor with whom he had a personal relationship in the role before selecting another employee who had a Ph.D. and seniority for the role. (*Id.* at 6.) Defendants state that "[d]espite her claim of being offended by Boudreaux in November 2018," Plaintiff did not complain to HR "until the midst of Shintech's selection process for the 2/3 day shift role[.]" (*Id.*) Defendants cite to the Internal Investigation Worksheet completed by Shintech HR Manager Coody, which states that Plaintiff did not characterize Boudreaux's behavior as sexual harassment. (*Id.* at 7.) Defendants

argue that Coody reprimanded Boudreaux nonetheless and that the alleged sexual harassment ceased. (*Id.* at 7–8.)

They also claim that they hired a Laboratory Manager to whom Boudreaux then reported. (*Id.* at 8.) In mid-2021, the company determined that a second day shift position could be added to the lab. (*Id.*) At the same time, the employee currently in the day shift left. (*Id.* at 9.) However, Shintech did not immediately fill the position due to other employment needs. (*Id.*) At this point, Defendants acknowledge that Plaintiff informed Coody of her health concerns and her need to take leave. (*Id.* at 10.) They assert that she "had never expressed to Coody or anyone in HR that shift work was taking a toll on her physical or mental health[]" prior to this. (*Id.*)

Defendants argue that Plaintiff was able to go on leave and then granted all requested accommodations. (*Id.*) Defendants claim that upon returning to work in the day shift position, Plaintiff again complained of Boudreaux's behavior: specifically, she complained that he was "sharing her medical information with co-workers" and making other negative comments about her. (*Id.* at 11–12.) After an investigation that corroborated Plaintiff's complaints, Boudreaux was suspended, removed from his supervisory position, and transferred out of the lab. (*Id.* at 12.) Defendants note that Plaintiff later complained of possible ventilation issues in the lab. (*Id.* at 13.) She was "officially and permanently placed in the 2/3 day shift position" on June 27, 2022, but left in July of 2022 for another position. (*Id.*)

Defendants argue that Plaintiff's Title VII claims for a hostile work environment and/or quid pro quo harassment should be dismissed under the *Faragher/Ellerth* analysis. (*Id.* at 14.) First, they assert, Plaintiff has not established that she suffered a tangible employment action such that her suit may be classified as a quid pro quo case. (*Id.* at 14–15.) Defendants contend that Plaintiff's alleged constructive discharge cannot be considered the tangible employment action

here "because Plaintiff admits that Boudreaux's alleged sexual harassment ceased after Shintech's investigation in March 2020, about two years and three months before she resigned." (*Id.* at 15.) They argue that at the time of her resignation, Plaintiff had in fact "been awarded the sought after 2/3 day position." (*Id.* at 16.)

In addition, Defendants argue that the "failure to transition Plaintiff to a day shift position cannot constitute a tangible employment action[]" because, they assert, Boudreaux ceased to have authority to transfer Plaintiff beginning in October 2020, nearly two years prior to Plaintiff's resignation. (*Id.* at 17.) They claim that in the initial two years of Plaintiff's employment, when Boudreaux did have the authority to transfer, Plaintiff cannot show that the failure to transfer was a tangible employment action. (*Id.* at 17–18.) They argue that a tangible employment action requires a change in employment status, and a failure to transfer is not such a change. (*Id.* at 18.) Even if it were a tangible employment action, Defendants argue, Plaintiff cannot show a causal connection between the failure to transfer and her rejection of Boudreaux's sexual advances necessary to support a quid pro quo claim. (*Id.*)

As a result, Defendants assert that Plaintiff's claim should be considered a hostile work environment claim. (*Id.* at 14–15.) They argue that this too will fail, because "the alleged harassment by Boudreaux was not severe or pervasive[,] [a]nd, even if it was, Shintech acted immediately—and successfully—to remediate it, and Plaintiff unreasonably failed to take advantage of preventative measures or corrective opportunities provided by Shintech." (*Id.* at 20.)

Defendants similarly argue that Plaintiff's "'retaliatory hostile work environment' claim should be rejected[,]" asserting that the Fifth Circuit has never recognized such a claim. (*Id.* at 29.) They also argue that the constructive discharge claim should be dismissed because Plaintiff has not shown that a reasonable employee would have felt compelled to resign. (*Id.* at 29–30.) Instead,

they argue, "Shintech gave her everything that she asked for, including the day shift position and accommodations she requested to attend her therapy appointments." (*Id.* at 30.)

They note that Plaintiffs had previously accepted alternate employment and provided Defendants with two weeks' notice prior to resigning. (*Id.*) In sum, Defendants argue that Plaintiff has not alleged any harms sufficient to constitute adverse employment actions and has not connected these actions "to her alleged protected activity[,]" so her Title VII retaliation claim should be dismissed. (*Id.* at 30–31.)

Defendants next argue that Plaintiff's ADA failure to accommodate claim should likewise be dismissed. (*Id.* at 31.) They assert that "Plaintiff cannot establish that she suffered from a disability at any point from August 2018 – October 21." (*Id.*) They argue that Plaintiff has failed to provide any support for her "naked allegations" of "insomnia, migraine headaches, and major depression." (*Id.* at 32.) Defendants argue that "the only evidence Plaintiff could offer to support her allegations is doctor's notes that she submitted to Shintech over 6 months later in April 2022 in support of her requests for accommodations that she admits were fully granted by Shintech." (*Id.* at 33.)

In addition, Defendants argue that Plaintiff has provided "no evidence that Shintech was aware of any limitations resulting from her alleged impairments." (*Id.*) Defendants assert that Boudreaux's testimony that Plaintiff informed him of her trouble sleeping and migraines as a result of shift work are not sufficient to show that "Plaintiff was suffering an impairment that substantially limited a major life activity." (*Id.* at 34.) Likewise, they assert that Plaintiff's texts to Boudreaux informing him that she had contracted shingles due to stress are negated by Plaintiff texting Boudreaux, in response to his query "[a]nything I can do to help?" "No, it will be OK." (*Id.* at 34.) Defendants argue that at this time, Plaintiff had not asked for accommodations or to

work the day shift. (*Id.* at 35.) Defendants assert that Plaintiff's failure to establish that she had informed Shintech of a limitation resulting from her alleged disability is fatal to her claim. (*Id.*) Likewise, Defendants argue that Plaintiff's failure to show that she requested an accommodation requires the Court to dismiss her claim. (*Id.* at 35–37.)

B.    **Plaintiff's *Opposition* (Doc. 34)**

In her *Opposition*, Plaintiff argues that there are multiple genuine issues of material fact that preclude summary judgment. (Doc. 34 at 10.) First, she argues that that the differing accounts as to the occurrence and pervasiveness of Boudreaux's alleged acts must be assessed by a factfinder, and at summary judgment, must be construed in favor of Plaintiff. (*Id.*) Plaintiff asserts that Boudreaux's harassment "culminated in 'tangible employment action' sufficient to render Shintech vicariously liable for Boudreaux's acts." (*Id.* at 13.) She argues that that her resignation amounted to constructive discharge based on the "reasonable reaction of the employee" rather than the employer's subjective intent. (*Id.*) Plaintiff contends that her constructive discharge was the adverse employment action under Title VII. (*Id.* at 14.) Plaintiff likewise mainatins that the failure to transfer her to a day shift role after repeatedly promising her such a position is a tangible employment action. (*Id.*) She argues that other employees were placed into the day shift instead after she rejected Boudreaux's advances. (*Id.* at 15–16.)

Plaintiff argues that she repeatedly told Boudreaux about her trouble sleeping and migraines as a result of the shift work, which he failed to relay to HR. (*Id.* at 16.) She argues that despite Boudreaux's knowledge of her need for a day shift due to medical reasons, and despite her reliance on his assurances that she would be placed in a day shift, he prevented her from being placed on such a day shift. (*Id.*) Plaintiff alleges that as a result of these failures, she "suffered significant mental and physical decline" resulting in her requesting and taking a leave of absence

to obtain roughly six months of in- and out-patient mental health treatment. (*Id.* at 17.) Plaintiff argues that an "adverse action" must only leave her worse off, and Defendants' refusal to transfer her to a day shift suffices. (*Id.*) Plaintiff further argues that Defendants' "failure-to-accommodate, in and of itself, also constitutes tangible employment action." (*Id.*)

Plaintiff next asserts that Boudreaux's remarks to her coworkers, which she claims were intended to isolate her from them and share her medical information with them, were aggravating retaliatory factors. (*Id.* at 18.) Plaintiff states that these contributed to her feeling that she had to look for another job for the sake of her health. (*Id.*)

Plaintiff argues that, in addition, her hostile work environment claim survives summary judgment. (*Id.* at 19.) She claims that Defendants do not dispute that she belongs to a protected class or that she was subjected to harassment based on her sex, only whether the alleged harassment was severe and pervasive enough to affect a term of employment. (*Id.* at 19–20.) Plaintiff asserts that because her supervisor was her harasser, she does not need to show that her employer knew or should have known about the harassment and failed to take remedial action. (*Id.* at 19.)

Consequently, Plaintiff addresses only the question of whether the harassment was severe and pervasive and whether it affected a term, condition, or privilege of employment. (*Id.* at 20.) She argues that the severity and pervasiveness of Boudreaux's conduct is a genuine question of material fact that must survive summary judgment. (*Id.*) Plaintiff contends that Boudreaux admitted to the following: asking Plaintiff on a date, which he did not do to other female employees, referring to her by her first name, calling her "sweetie" and "stunning," making comments about her eyelashes, initiating a conversation with Plaintiff about her relationships, telling Plaintiff that he believed she "was a 'submissive,'" and "sending Plaintiff a link about a 'sub drop[.]'". (*Id.* at 20–21.) Plaintiff also alleges that Boudreaux touched her inappropriately by

repeatedly brushing his arm against her breasts or side and touching her back. (*Id.* at 21.) She asserts that as a result of this pattern of behavior, she changed the way she dressed at work. (*Id.* at 22.)

Importantly, Plaintiff disputes Defendants' argument that Plaintiff did not think of Boudreaux's actions as sexual harassment and their reliance on the Internal Investigation Worksheet completed by Coody. (*Id.* at 24.) She asserts that she "did not compile this or have any participation in it[,]" and that it fails to say anything about sexual harassment, which she states was her primary concern. (*Id.*; *see* Doc. 34-2 at 26.) Plaintiff argues that this Worksheet is not reflective of her conversation with Coody and in fact that Coody's notes are "changing [her] words." (Doc. 34 at 24; Doc. 34-2 at 26.) Instead of responding to a query about whether Boudreaux was sexually harassing her with "No. I think he's just stupid[,]" Plaintiff asserts that she said, "He is sexually harassing me and maybe he doesn't even know it because he's so stupid." (Doc. 34 at 24; Doc. 34-2 at 26.) Plaintiff argues that Coody repeatedly omitted her allegations of sexual harassments from written documentation. (Doc. 34 at 25; Doc. 34-2 at 36.) She asserts that she did, in fact, perceive Boudreaux's actions as sexual harassment and that a reasonable juror could find it to be so. (Doc. 34 at 25.)

Plaintiff next argues that Defendants have not established a *Faragher/Ellerth* defense because they have not shown that they took reasonable care to prevent Boudreaux's harassment; she contends that they intensified their trainings in the years following her claims. (*Id.* at 26–27.) She also argues that they did not engage in prompt remedial action. (*Id.* at 27–28.) Plaintiff maintains that she not only informed Coody of sexual harassment at their meeting on March 13, 2020, but that she specifically informed Coody of a conversation Boudreaux initiated about sexual role play and bondage, which both parties often refer to as the "sub drop" conversation, and a

subsequent text message on the same subject. (*Id.* at 28.) Plaintiff notes that Coody testified that if she had seen the relevant text message, Boudreaux would have been terminated at that time. (*Id.*) Plaintiff asserts that this is a genuine issue of material fact. (*Id.*)

Plaintiff also maintains that Coody did not conduct a prompt or thorough investigation following her March 2020 report. (*Id.* at 29.) Additionally, she claims that while Boudreaux may have stopped sexually harassing her following March 19, 2020, he continued to retaliate against her. (*Id.* at 29–30.) Plaintiff asserts that Coody told her that Boudreaux should have been moved following the March 2020 complaint. (*Id.* at 30.) Plaintiff also argues that the *Faragher/Ellerth* defense fails because she did take advantage of the preventive or corrective opportunities by reporting to HR in March of 2020 and subsequently. (*Id.* at 30–31.)

Plaintiff next argues that her retaliation claim should survive summary judgment because a "relaxed 'adverse action' standard" applies in Title VII cases. (*Id.* at 31–32.) Plaintiff argues that she faced retaliatory acts that were in themselves harassment and constituted "sufficient 'aggravating factors' to warrant Plaintiff's constructive discharge[.]" (*Id.* at 32.) Plaintiff also asserts that she faced a "retaliatory hostile work environment[,]" which she acknowledges that the Fifth Circuit has not recognized but which has been recognized in other circuits. (*Id.* at 33 (collecting cases).) She encourages the Court to "assume that such a claim exists under Title VII." (*Id.* at 34.)

Finally, Plaintiff argues that she has asserted a claim for failure to accommodate under the ADA, because her depression and insomnia do qualify as statutory disabilities, (*id.* at 36–37), Boudreaux was aware of these limitations as well as her need for a daytime position, (*id.* at 37–39), and despite this, Boudreaux did not initiate the interactive accommodations process or report these concerns to HR in order to initiate that process, (*id.* at 39–40.)

### C.    Defendants' *Reply* (Doc. 37)

In their *Reply*, Defendants reiterate their argument that Plaintiff's quid pro quo claim fails because, they assert, she did not suffer a constructive discharge and the failure to transfer does not constitute an adverse employment action. (Doc. 37 at 1–5.) In addition, they reiterate their argument that she cannot show a causal link between her rejection of Boudreaux's alleged sexual harassment and any adverse employment action. (*Id.* at 5–6.) They next argue that Plaintiff's hostile work environment claim should fail, because she has not presented evidence of the severity or pervasiveness of the alleged harassment. (*Id.* at 6.) They assert that any social interactions Plaintiff had with Boudreaux undermine her allegations of harassment, as does, according to Defendants, the time lapse between the initial alleged harassment and Plaintiff's report to HR. (*Id.* at 9–10.) In addition, Defendants maintain their arguments that the *Faragher/Ellerth* defense applies, claiming that they exercised reasonable care to prevent and correct harassment. (*Id.* at 10–13.) Defendants again argue that by waiting 16 months, during which time Plaintiff alleges the harassment was ongoing, Plaintiff demonstrated an "inexplicable delay" in reporting. (*Id.* at 13.)

Defendants next argue that Plaintiff's Title VII retaliation claim should be dismissed, asserting that after her *Opposition*, the only retaliation claims remaining are with regard to the March 2020 failure to transfer, the retaliatory hostile work environment, and the retaliatory constructive discharge. (*Id.* at 13–14.) Defendants assert that this failure to transfer was not an adverse action and Plaintiff cannot prove causation. (*Id.* at 14–16.) Defendants next argue that retaliatory hostile work environment is not a claim recognized in the Fifth Circuit and would not succeed on the merits regardless. (*Id.* at 16–17.)

Defendants finally reiterate their arguments that Plaintiff's failure to accommodate claim should be dismissed, asserting that she was not disabled during the relevant timeframe, that she

has offered no evidence that Shintech was aware of her limitations, and that she did not adequately request an accommodation. (*Id.* at 19–23.) Consequently, they argue, the Court should grant summary judgment on all claims.

## III.  LEGAL STANDARDS

### A.  Summary Judgment

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not negate the elements of the nonmovant's case.'" *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp.*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party

support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (internal quotation marks omitted)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (cleaned up).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (cleaned up).

## B.    Title VII

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). "Title VII's prohibition against discrimination extends to protect against either 'a tangible employment action, such as a demotion or denial of promotion, or . . . a hostile or abusive working environment.'" *Johnson v. Bd. of Supervisors of La. State Univ.*, 90 F.4th 449, 455 (5th Cir. 2024) (citing *Lauderdale v. Tex. Dep't of Crim. Just.*, 512 F.3d 157, 162 (5th Cir. 2007); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011)). "To establish a discrimination claim under Title VII . . ., a plaintiff must prove that he or she was subject to an 'adverse employment action[.]'" *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281–82 (5th Cir. 2004); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).

"[T]o plead an adverse employment action, a plaintiff need only allege facts plausibly showing discrimination in hiring, firing, compensation, or in the 'terms, conditions, or privileges' of his or her employment." *Hamilton v. Dalas Cnty.*, 79 F.4th 494, 502–03 (5th Cir. 2023) (citing 42 U.S.C. § 2000e-2(a)(1); *Hishon v. King & Spalding*, 467 U.S. 69, 77 (1984)). While "the statutory phrase, 'terms, conditions, or privileges of employment,' is broad[,]" *id.* at 503, the Fifth Circuit has reiterated that Title VII "does not permit liability for de minimis workplace trifles[,]" *id.* at 505 (citing *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021); *Chambers v. D.C.*, 35 F.4th 870, 883, 890 (D.C. Cir. 2022); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005)).

The Supreme Court recently provided additional guidance as to the required harm threshold, holding that "at least in the context of a forced transfer, 'although an employee must show some harm . . . to prevail in the Title VII suit, she need not show that the injury satisfies a significance test.'" *Smith v. Kendall*, No. 23-50713, 2024 U.S. App. LEXIS 25440 at *12, 2024

WL 4442040 at *5 (5th Cir. Oct. 8, 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024) (holding that the lower court erred in requiring "significant harm")).

A constructive discharge "claim requires a plaintiff, at summary judgment, to offer evidence that the employer made the employee's work conditions 'so intolerable that a reasonable employee would feel compelled to resign.'" *Johnson v. PRIDE Indus.*, 7 F.4th 392, 406–07 (5th Cir. 2021) (quoting *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008); *see Dediol*, 655 F.3d at 444. Such evidence "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to establish a prima facie hostile work environment claim." *Johnson*, 7 F.4th at 407 (citing *Stover*, 549 F.3d at 991). In determining whether a reasonable employee would feel compelled to resign,

> courts consider the relevancy of the following events: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Dediol*, 655 F.3d at 444 (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

"Title VII prohibits sexual harassment in the workplace." *Arredondo v. Elwood Staffing Servs.*, 81 F.4th 419, 432 (5th Cir. 2023) (citing *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 220 (5th Cir. 2023)). "A plaintiff may pursue two theories to demonstrate sexual harassment under Title VII," quid pro quo harassment and hostile work environment. *Id.* (citing *Wallace*, 57 F.4th at 220).

In order to show quid pro quo harassment "[a]t the summary judgment stage, [a plaintiff is] obliged to set forth evidence from which a reasonable jury could find (1) that she suffered a 'tangible employment action' and (2) that the action was causally related to the acceptance or

rejection of [her supervisor]'s sexual harassment." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 170 (5th Cir. 2018) (citing *Casiano v. AT&T Corp.*, 213 F.3d 278, 283–84 (5th Cir. 2000)). This is a two-step process, first requiring courts "to determine whether the complaining employee has or has not suffered a 'tangible employment action.'" *Casiano*, 213 F.3d at 283 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998)); *see also Arredondo*, 81 F.4th at 432. If so, the "suit is classified as a 'quid pro quo' case[.]" *Id.*

"Once a plaintiff has established that she suffered a tangible employment action, the next step is that she must demonstrate that the action resulted from her acceptance or rejection of her supervisor's alleged sexual harassment." *Arredondo*, 81 F.4th at 432 (citing *Casiano*, 213 F.3d at 283). "[I]f the employee can demonstrate such a nexus, the employer is vicariously liable per se and is not entitled to assert the one and only affirmative defense permitted in such cases since" the Supreme Court's decisions in *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). *Casiano*, 213 F.3d at 283–84 (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 808). "When a case is classified as *quid pro quo*, affirmative defenses are unavailable, and an employer is *per se* vicariously liable for a supervisor's harassment if the plaintiff proves that 'the tangible employment action suffered by the employee resulted from his acceptance or rejection of his supervisor's alleged sexual harassment." *Taylor v. McDonough*, 2024 U.S. App. LEXIS 8426, at *11, 2024 WL 1504343, at *4 (5th Cir. Apr. 8, 2024) (quoting *Casiano*, 213 F.3d at 283).

However, "if the first-stop question is answered in the negative, *i.e.*, the employee did not suffer a tangible employment action[,] . . . the suit is a 'hostile environment' case, and the other branch at the fork in the *Ellerth/Faragher* road must be followed." *Casiano*, 213 F.3d at 284. In order to show a hostile work environment, a plaintiff must demonstrate that "(1) the employee belonged to a protected class; (2) the employee was subject to unwelcome harassment; (3) the

harassment was based on the protected class; (4) the harassment affected a 'term, condition, or privilege' of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action." *Clark v. City of Alexandria*, 116 F.4th 472, 479 (5th Cir. 2024) (quoting *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 923 (5th Cir. 2022)). "To affect a term, condition, or privilege of employment, the [] harassment must have been 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Slaughter v. Torres*, 592 F. Supp. 3d 515, 528 (M.D. La. 2022) (deGravelles, J.) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

### C.    The Americans with Disabilities Act

The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" § 12112(b)(5)(A).

"To make a prima facie case of disability discrimination under the ADA, [a plaintiff] must establish that '(1) she has a disability or was regarded as disabled, (2) she was qualified for the job, and (3) she was subject to an adverse employment decision on account of her disability.'" *Jennings v. Towers Watson*, 11 F.4th 335, 344 (5th Cir. 2021) (quoting *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 & n.4 (5th Cir. 2017)) (cleaned up).

"To prevail on her failure-to-accommodate claim, [a plaintiff] must show that '(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Id.* at 343 (quoting *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (internal quotations omitted)).

"The ADA defines 'disability' as, with respect to an individual, 'a physical or mental impairment that substantially limits one or more major life activities of such individual.'" *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 478 (5th Cir. 2023) (quoting 42 U.S.C. § 12102(1)(A)). However, "'[m]erely having an impairment' is not enough to qualify as disabled under the ADA—a plaintiff 'also needs to demonstrate that the impairment substantially limits a major life activity.'" *Id.* at 479 (quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009)) (cleaned up). "The ADA defines a 'major life activity' as including 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working,'" *id.* (quoting 42 U.S.C. § 12102(2)(A)), "as well as 'the operation of a major bodily function, including . . . neurological [and] brain . . . functions,'" *id.* (quoting 42 U.S.C. § 12102(2)(B)) (alterations in *Mueck*).

## IV. ANALYSIS

### A. Title VII

#### a. *Constructive Discharge*

The Court first addresses Plaintiff's constructive discharge claim. Defendants largely treat this as a form of "tangible employment action" rather than a distinct claim; however, they do argue that as a separate claim, Plaintiff's assertion of constructive discharge should not survive summary

judgment. (Doc. 24-2 at 30.) Under Fifth Circuit precedent, the Court considers whether Plaintiff

experienced any of the following events that would cause her to feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

> *Dediol*, 655 F.3d at 444 (citing *Brown*, 237 F.3d at 566).

Plaintiff argues that she was harassed by Boudreaux, that he refused or failed to transfer or

reassign her to the day shift, that he failed to accommodate her alleged disabilities, and that he

"attempt[ed] to ostracize Plaintiff and isolate her from her co-workers[.]" (Doc. 34 at 18–19.) She

does not assert any demotion, reduction in salary or job responsibility, reassignment, or offers of

early retirement. (*See id.*) Instead, Plaintiff focuses on the sixth factor, the alleged harassment and

humiliation she experienced at the hands of Boudreaux. (*Id.* at 14, 18–19, 24–25.)

Despite her allegations of harassment, humiliation, and isolation, Plaintiff at no point

argues, much less shows, that Boudreaux or any other Shintech employee sought to encourage

Plaintiff to resign. (*See id.* at 31–33.) Instead, Plaintiff acknowledges that "Shintech used it as an

opportunity [to] 'coach' Boudreaux," telling "him to 'keep business as usual' and 'keep it

professional[.]'" (*Id.* at 29.) Likewise, Shintech HR Coody testified that "we came down pretty

hard on [Boudreaux]," noting that they "wrote up all the issues[]" despite Boudreaux's denials.

(Doc. 34-4 at 12.) Coody testified that when Plaintiff brought sexual harassment complaints to

HR, Coody "assured her that she didn't have anything to worry about. That we would investigate

it thoroughly and that she wouldn't have to fear about retaliation from [Boudreaux]." (*Id.* at 14–

15.) Plaintiff does not dispute this. Likewise, Coody testified that Plaintiff was given the day shift

position she had requested in the fall of 2021, after which she took leave until 2022 before returning

18

in the day shift position. (*Id.* at 24–25.) Notably, Coody testified that Boudreaux and another supervisor had recommended Plaintiff, as well as another employee, for this position. (*Id.*)

Plaintiff argues that Boudreaux was left in a supervisory position after she complained of sexual harassment. (Doc. 34 at 30.) Although she does not explicitly argue that this was intended to encourage her to resign, she does assert that this was key to Defendants' failure to remedy the situation, which caused her constructive discharge. (*Id.* at 30, 34.) Coody contradicts this, testifying that Boudreaux faced reprimands when Plaintiff first complained of his behavior to HR. (Doc. 34-4 at 13, 15.) Importantly, Coody testifies that Plaintiff did not inform her of the "sub drop" conversation until 2022, at which point Coody conducted another investigation. (*Id.* at 18.) In the course of this investigation, she discovered that Boudreaux had violated the HR instructions he had received to not discuss Plaintiff beyond providing work instructions. (*Id.* at 28.) As a result, he was suspended and removed from his supervisory position. (*Id.*) Again, Plaintiff does not dispute that Boudreaux received these consequences. (Doc. 34-1 at 19, 26–27.)

In sum, Plaintiff does not dispute that HR took actions when she reported harassment, although she does dispute the timeliness and appropriateness of the HR actions. Plaintiff does not dispute that ultimately, the day shift position was not only offered to her but also held for her until after she returned from medical leave. (*Id.* at 22.) While Plaintiff may have raised genuine issues of material fact as to her harassment, as analyzed below, a constructive discharge claim requires more than mere harassment or humiliation: the Court must consider whether the harassment was "calculated to encourage the employee's resignation." *Dediol*, 655 F.3d at 444. Plaintiff has not alleged, much less shown, any actions calculated to encourage Plaintiff's resignation. Consequently, Plaintiff has not demonstrated any of the factors that the Court considers in evaluating a claim of constructive discharge.

###### b. *Quid Pro Quo*

The Court next follows the *Ellerth/Faragher* framework in assessing Plaintiff's claim of sexual harassment, as Defendants' *Motion for Summary Judgment* largely does in challenging it. First, the Court looks at whether Plaintiff has suffered a "tangible employment action." As analyzed above, Plaintiff's resignation does not constitute a constructive discharge and therefore does not constitute a tangible employment action. Plaintiff argues that even if her resignation does not constitute a tangible employment action, Defendants' refusal to move her to the day shift over the three-year span from May 2019 to May 2022 was itself a tangible employment action. (Doc. 34 at 15–16.) In support, Plaintiff points to the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), in which the Supreme Court held that a Title VII plaintiff complaining of a forced transfer "need show only some injury respecting her employment terms or conditions[]" rather than a "'significant' harm." 601 U.S. at 359–60. Plaintiff asserts that when she began to go on a rotating night/day shift in May 2019, she "began feeling 'worse off' by being locked into a rotating shift, as opposed to a rotating day shift." (Doc. 34 at 15.) Plaintiff claims that "Boudreaux confirms that Plaintiff told him she was having trouble sleeping swapping back from days to nights" and that she was having migraines and "experiencing significant health issues as a result of the rotating shift work[.]" (*Id.* at 16.)

As the Fifth Circuit has explained, "[i]n *Burlington Industries, Inc., v. Ellerth*, the Supreme Court defined a tangible employment action as 'a significant change in employment status, such as hiring, firing, *failing to promote*, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Davenport*, 891 F.3d at 170 (quoting *Ellerth*, 524 U.S. at 761) (emphasis added). The Fifth Circuit has held that "denying a woman a transfer from being a state trooper to becoming a Texas Ranger, allegedly based on sex, was equivalent to

the denial of a promotion . . . because, despite the pay-scale being the same, becoming a Texas Ranger was considered objectively better in that line of work." *Wallace v. Performance Contrs., Inc.*, 57 F.4th 209, 218–19 (5th Cir. 2023) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 614–15 (5th Cir. 2007)). Likewise, the Fifth Circuit has held that "[i]n light of the allegation that full weekends off is a preferred shift for both men and women, it is plausible that requiring female officers to work weekends but not male officers is a 'tangible,' 'objective,' and 'material' instance of sex discrimination in the terms, conditions, or privileges of employment—and far more than 'de minimis.'" *Hamilton*, 79 F.4th at 505. The appellate court explicitly endorsed the Sixth Circuit's holding "that 'a shift schedule is a term of employment[,]'" *id.* at 503 (quoting *Threat*, 6 F.4th at 677 (cleaned up)), stating "[i]t's that simple." *Id.* at 504.

Plaintiff here likewise alleges that she was denied a transfer to the day shift, which all parties concede was a preferred shift among employees. (Doc. 34 at 14.) She explains the harms caused by the denial of this transfer: a disturbed sleep schedule, physical ailments, and decreased mental well-being. (*Id.* at 16.) Defendants cite to two unpublished out-of-circuit district court cases from over fifteen years ago for their arguments that a refusal to transfer an employee does not constitute a tangible employment action. (Doc. 24-2 at 18 (citing *Casolare v. Cnty. of Onondaga*, No. 5:00-1500, 2006 U.S. Dist. LEXIS 47622, at *35, 2006 WL 1877139, at *11 (N.D.N.Y. July 6, 2006); *McMillian v. Ala. Dep't of Youth Servs.*, No. 2:07-001, 2008 U.S. Dist. LEXIS 46637, at *22, 2009 WL 2441043, at *7 (M.D. Ala. June 16, 2008)).) The Court follows the more recent holdings on transfers and shift schedules from the Supreme Court and the Fifth Circuit: Plaintiff has adequately shown that the failure to transfer her to the day shift was an injury respecting the terms or conditions of her employment. *See Muldrow*, 601 U.S. at 359–60; *Hamilton*, 79 F.4th at 505; *Wallace*, 57 F.4th at 218–19.

However, Defendants' argument is not limited to whether the failure to transfer was a tangible employment action: they also argue that a tangible employment action can only occur in the quid pro quo context when it is taken by the harassing supervisor. (Doc. 24-2 at 17.) Defendants assert that Boudreaux ceased to hold a supervisory position over Plaintiff in October 2020, and as such, "from October 2020 on, Boudreaux's actions cannot form the basis for a quid pro quo claim." (*Id.*) However, Defendants also state that "Boudreaux *chose Plaintiff* as most qualified for the day shift position she desired in August 2021[,]" indicating that he still maintained some power over whether she obtained a day shift position. (Doc. 37 at 3.) Furthermore, Shintech HR Coody testified that Boudreaux was not removed from his supervisory job until after Plaintiff returned from medical leave in 2022. (Doc. 24-8 at 11–12.)

A tangible employment action "occurs when "*the supervisor* brings the official power of the enterprise to bear on subordinates.'" *Taylor*, 2024 U.S. App. LEXIS 8426, at *13 (quoting *Ellerth*, 524 U.S. at 762). "A person is a 'supervisor' for purposes of sexual-harassment law when he or she can take tangible employment action against the victim." *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 214 (5th Cir. 2016) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)); *Johnson*, 90 F.4th at 457 n.5 ("A supervisor is defined as an employee 'empowered . . . to take tangible employment actions against the victim.'" (internal citations omitted)).

Plaintiff asserts that Boudreaux remained in a supervisory position until June 2022. (Doc. 34-1 at 26.) She claims that until then, Boudreaux maintained a supervisory position that allowed him to "make recommendations regarding transfers and promotions" and to "be involved in the interview process." (*Id.* at 19.) In support, Plaintiff points to the deposition of Shintech HR Coody, who likewise states that Boudreaux was not removed from a supervisory position until approximately May 2022 and that Boudreaux recommended Plaintiff for a day shift in the fall of

2021. (Doc. 34-4 at 25–6, 29.) Although Defendants have presented evidence that other supervisors were also involved in transfer decisions, Plaintiff has sufficiently established genuine issues of material fact that would allow a reasonable factfinder to conclude that Boudreaux retained the power to take tangible employment actions against her until the spring of 2022. *C.f. Pullen*, 830 F.3d at 214.

However, it is not sufficient for Plaintiff to establish that she had a supervisor and that a tangible employment action was taken. She must show "that the action resulted from her acceptance or rejection of her supervisor's alleged sexual harassment." *Arredondo*, 81 F.4th at 432 (citing *Casiano*, 213 F.3d at 283). Plaintiff has not alleged that Boudreaux's failure to transfer her to the day shift resulted from her rejection of his alleged sexual harassment. Instead, she alleges that Boudreaux overtly favored his personal friend, Shannon Vasquez, and attempted to place Vasquez in the day shift over any of the other more qualified employees. (Doc. 34-1 at 11–12.) Following "the substantial backlash Boudreaux received for his original decision," Boudreaux then proceeded to select another female employee who had a Ph.D. to fill the day shift position. (Doc. 34 at 36.)

Although Plaintiff argues that Boudreaux was "looking for anyone but Plaintiff to fill the spot[,]" she has not provided the Court with anything supporting this claim. (*Id.*) Indeed, Plaintiff alleges that the next time a day shift was available, Boudreaux again attempted to award it to Vasquez before Plaintiff was instead offered the position. (Doc. 34-2 at 34.) Rather than indicating that Boudreaux was "looking for anyone but Plaintiff to fill the spot[,]" Plaintiff's own allegations merely demonstrate Boudreaux's favoritism towards his friend. (Doc. 34 at 36.) Plaintiff has not shown a nexus between her rejection of Boudreaux's alleged sexual harassment and his failure to transfer her to a day shift.

### c.    Hostile Work Environment

In order to show a hostile work environment at summary judgment, a plaintiff must demonstrate issues of fact regarding whether "(1) the employee belonged to a protected class; (2) the employee was subject to unwelcome harassment; (3) the harassment was based on the protected class; (4) the harassment affected a 'term, condition, or privilege' of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action." *Clark*, 116 F.4th at 479 (quoting *Bye*, 49 F.4th at 923). "A hostile work environment exists when a workplace is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Wallace*, 57 F.4th at 222 (quoting *Johnson*, 7 F.4th at 399. "Harassment is 'severe or pervasive enough' when (1) a reasonable person in the plaintiff's position would find it hostile or abusive, and (2) the plaintiff subjectively perceived the harassment as abusive." *Id.* (citing *Johnson*, 7 F.4th at 400). The first factor, "[t]he objective element[,] is determined based on all the facts and considers factors (each independently non-dispositive) such as: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citing *Johnson*, 7 F.4th at 400).

The parties do not dispute that Plaintiff belongs to a protected class, nor that she was subject to unwelcome sexual harassment based on her sex. (Doc. 24-2 at 19–21.) Instead, Defendants focus instead on whether "the harassment affected a term, condition, or privilege of the plaintiff's employment." (Doc. 24-2 at 20.) They argue that it was not "sufficiently severe or pervasive to alter the conditions" of Plaintiff's employment. (*Id.* (quoting *Lewis v. Eye Care Surgery Ctr., Inc.*, No. 21-475, 2023 U.S. Dist. LEXIS 228795, at *21–22, 2023 WL 8880348, at *9 (M.D. La. Dec.

22, 2023) (Dick, C.J.) Defendants argue that Plaintiff herself "did not think Boudreaux was sexually harassing her[,]" and that "a reasonable person could not find that Boudreaux's alleged conduct, even assuming it all occurred, was sufficiently severe or pervasive such that Plaintiff's opportunity to succeed in the workplace was destroyed." (*Id.* at 21.)

In *Wallace*, the Fifth Circuit found harassment sufficient to meet the severe-or-pervasive objectively hostile standard where one supervisor made "at least weekly" comments about the plaintiff's physical appearance, another supervisor "asked to grab her breasts on several occasions[,]" and a co-worker made a "sexual comment and massag[ed]" her on one occasion. *Wallace*, 57 F.4th at 222–23.

In contrast, in *Saketkoo v. Adm'rs of the Tulane Educ. Fund*, the Fifth Circuit affirmed summary judgment on a hostile work environment claim, finding the alleged conduct was not sufficiently severe or pervasive where the plaintiff alleged "sporadic and abrasive conduct over the course of four years." 31 F.4th 990, 1003 (5th Cir. 2022). This conduct included being cut off, interrupted, yelled at, and mocked by her supervisor. *Id.* Likewise, the Fifth Circuit affirmed summary judgment recently in *Hawthorne v. Birdville Indep. Sch. Dist.*, finding that the conduct not sufficiently severe or pervasive where the plaintiff alleged merely that his supervisor frequently discussed "her sexual relationship with her husband, but 'not in graphic detail[,]' . . . with 'anyone who would listen,' including men and women." No. 24-10398, 2025 U.S. App. LEXIS 3121, at *1, 2025 WL 457312, at *1 (5th Cir. Feb. 11, 2025).

Here, Plaintiff asserts that on November 7, 2018, while in Boudreaux's truck on the way to a lab, Boudreaux initiated an unsolicited conversation about sexual activities including bondage and role play, telling her that she "would fall into the category of 'submissive'" and that she "needed someone who knew how to take care of [her.]" (Doc. 1 at ¶ 19.) After this conversation,

Plaintiff alleges that Boudreaux sent her a text with a link about these same topics. (*Id.* at ¶ 21.) Plaintiff also asserts that Boudreaux consistently called her by pet names such as "sweetie" and "stunning[.]" (*Id.* at ¶ 22.) Plaintiff further asserts that Boudreaux repeatedly touched her inappropriately on her side, back, waist, and bra line, and that he "would unnecessarily brush his body against her." (*Id.* at ¶ 25.) In her deposition testimony, Plaintiff also notes that "[a]ny time that he really could, he would cause his arm to brush up on the side of my breast[.]" (Doc. 34-2 at 20.) In addition, Plaintiff asserts that Boudreaux asked her on a date and invited her to accompany him on a vendor-sponsored cruise in New York City, both of which Plaintiff declined. (Doc. 1 at ¶¶ 24, 26, 31.) Plaintiff also claims that throughout her employment, Boudreaux commented on her appearance, including her makeup, which led her to stop wearing makeup and to wear oversized lab equipment in an attempt to prevent his comments. (*Id.* at ¶¶ 28–29.) In her deposition testimony, Plaintiff describes an instance in 2019 where employees went to dinner and then bowling, after which Boudreaux—again unsolicited—followed her home. (Doc. 34-2 at 19.) She also notes a second instance when Boudreaux asked her to dinner in June of 2019. (*Id.*).

In his deposition testimony, Boudreaux acknowledged touching employees' backs and shoulders when walking past but denied any other physical touching with Plaintiff. (Doc. 34-3 at 30.) He claims that the two of them shared information about their personal lives with each other, including about their respective divorces. (*Id.* at 29.) Boudreaux does not deny that he sent Plaintiff a link about sexual bondage or role play, but he claims that she expressed interest in receiving the link. (*Id.* at 30–31.) Boudreaux asserted that this conversation was about emotional relationships rather than anything sexual, but he acknowledges that he initiated the conversation. (*Id.* at 31–32.) Boudreaux acknowledged commenting on Plaintiff's eyelashes and asking her out on a date. (*Id.* at 35–36.) He also acknowledged inviting her on the vendor cruise, but he asserted that this

invitation was made to a group. (*Id.* at 34–35.) However, one of the employees who was allegedly part of the group stated in her deposition that she only learned of Boudreaux's invitation to Plaintiff "much later." (Doc. 34-6 at 17.) The same employee also testified that Boudreaux told her that he had followed Plaintiff home from an employees' team building activity, but that he asserted he had only done so because Plaintiff had been drinking. (*Id.* at 24.)

Plaintiff also presents deposition testimony from another Shintech employee, Kristi Riley, stating that Boudreaux "would spend extra time . . . to talk to" Plaintiff and that people in the office "could notice and tell that maybe [Boudreaux] was a little sweet on her because it seemed like he was always trying to make his way to her[.]" (Doc. 34-7 at 10.) Riley noted that "there was a different treatment amongst her versus other lab techs." (*Id.* at 11.) Riley testified that Plaintiff "confided in [her] . . . that [Boudreaux] [] came on to her in ways that she was uncomfortable with" and that "we noticed that, you know, [Boudreaux] he might be around her and we can tell she really doesn't want to be bothered." (*Id.*) Riley testified that throughout the first couple of years of Plaintiff's employment at Shintech, her demeanor became "a little bit more guarded and shut off, like something may have happened[.]" (*Id.* at 13.)

Likewise, Shintech employee Zenaida Brown testified that Boudreaux would make jokes that were "sexual in nature" and "was trying to get [Plaintiff] to go out so they could discuss, I guess, maybe divorce or coping with that." (Doc. 34-8 at 9.) She stated that Plaintiff "wasn't too enthused, or she didn't seem interested, I'll say." (*Id.*) Brown testified that Plaintiff confided in her at least twice about potentially inappropriate comments from Boudreaux, although Brown was unable to remember the specific content of the comments. (*Id.*) She noted that while Boudreaux was "always more like in personal spaces, in general, like with everybody[,]" he was "[m]ore so

with [Plaintiff]." (*Id.* at 10.) Like Riley, Brown testified that the common belief amongst the lab techs and contract workers was that Boudreaux was "sweet on" Plaintiff. (*Id.*)

Shintech employee Tania Hicks likewise testified that Boudreaux was sweet on Plaintiff. (Doc. 34-11 at 8.) Hicks also testified that she "may have seen [Boudreaux], you know, put his hand on [Plaintiff's] back" and that he "kind of was touchy-feely sometimes" but that she didn't remember more than that. (*Id.* at 10.) She did not recall whether he touched her in a similar way. (*Id.*) Hicks testified that Plaintiff seemed "more tired" and not "as happy overall" as her time at Shintech progressed on a rotating shift. (*Id.*) Hicks also noted that Plaintiff "wasn't comfortable with the way [Boudreaux] talked to her." (*Id.* at 20.)

Similarly, while Shintech employee Cole Miner testified that he did not discern any inappropriate relationship between Boudreaux and Plaintiff, he described Boudreaux's behavior towards Plaintiff as "a little more of an affectionate variety as opposed to other people." (Doc. 34-10 at 10.)

While Plaintiff does not state the exact frequency of Boudreaux's comments about her appearance, inappropriate physical touches, or other advances, she has presented not only her own testimony but that of numerous co-workers supporting her allegations. (Docs. 34-7, 34-8, 34-11.) A reasonable jury could find that between her hiring in August of 2018 and Boudreaux's reassignment in July of 2022, Boudreaux asked her out repeatedly despite her refusals, touched her unnecessarily, called her diminutive nicknames, made personal comments about her appearance, sent her an article about sexual role play after initiating an unsolicited conversation about sexual bondage and role play, and at one point, followed her to her home after a team building activity. In *Wallace*, weekly comments about a plaintiff's physical appearance, repeated requests to grab the plaintiff's breasts, and one instance of a sexual comment and massage were

28

sufficiently severe and pervasive to find a hostile work environment. 57 F.4th at 222–23. The Court finds Plaintiff has established circumstances adequately similar to *Wallace* to meet the severe and pervasive standard. As such, she has carried her summary judgment burden with respect to this prong of her hostile work environment claim.

Plaintiff has also established that she contacted Shintech HR in March of 2020. (Doc. 34-4 at 11.) She has therefore established a prima facie case as to her hostile work environment claim.

However, Defendants have asserted that Plaintiff's hostile work environment claim fails under the *Ellerth/Faragher* affirmative defense. (Doc. 24-2 at 19.) They argue that first, "the alleged harassment by Boudreaux was not severe or pervasive[,]" and second, "even if it was, Shintech acted immediately—and successfully—to remediate it, and Plaintiff unreasonably failed to take advantage of preventative measures or corrective opportunities provided by Shintech." (*Id.* at 20.)

The *Ellerth/Faragher* affirmative defense requires that an employer "show[] both (1) that it exercised reasonable care to prevent and promptly correct any sexual harassment; and (2) that [the employee] unreasonably failed to take advantage of the appropriate HR procedures for dealing with sexual harassment." *Wallace*, 57 F.4th at 217. Here, the parties agree that on March 13, 2020, Plaintiff went to Coody to complain of Boudreaux's behavior. (Doc. 34-1 at 9.) Plaintiff and Coody do not agree on the specifics of what Plaintiff alleged at this meeting: Plaintiff claims that she informed Coody of the full extent of Boudreaux's alleged harassment, including the conversation and text messages about role play and bondage, (Doc. 34-2 at 26), while Coody claims that Plaintiff informed her of all of the alleged harassment except the conversation and texts about role play and bondage, (Doc. 34-4 at 27). Plaintiff asserts that although she told Coody about these text messages and others, Coody never asked for copies of messages Boudreaux sent Plaintiff. (*Id.* at 26–27.)

Plaintiff also asserts that Coody's write-up of the meeting is incomplete and leaves out her explicit accusations of sexual harassment, instead saying merely that Boudreaux was "just stupid[]" rather than "[h]e is sexually harassing me and maybe he doesn't even know it because he's so stupid." (Doc. 34-2 at 26.)

Coody acknowledges that most of her training in HR came from her previous job, rather than through any specialized training or a national group, and that she has conducted fewer than four sexual harassment discrimination claims over the course of her career. (Doc. 34-4 at 10, 12.) She testified in her deposition that although sexual harassment is "something that's not tolerated[]" at Shintech, the company did not have a "zero tolerance" policy. (*Id.* at 10.) Instead, harassment "will be investigated and could include discipline up to termination or something like that." (*Id.* at 11.) In her understanding, termination would be warranted "if a person was physically abusing a person[] [o]r if there was proven facts that substantiated any type of" sexual quid pro quo. (*Id.* at 10–11.) In addition, Coody states that if Plaintiff had told her about Boudreaux's conversation and text messages about sexual role playing and bondage at the time of Plaintiff's initial HR complaint, as Plaintiff alleges that she did, "[Boudreaux] would have been fired, period." (*Id.* at 18.)

However, after Plaintiff met with Coody in March of 2020, Boudreaux was not fired. He was reprimanded: "we instructed him that this [was] to never happen again, and that we would be ongoing watching his behavior, and it stopped." (*Id.* at 13.) Coody admitted that she did not know that the harassment stopped; she simply assumed it stopped because Plaintiff did not return to report further concerns to her between March of 2020 and taking medical leave in October of 2021. (*Id.* at 31.) During this time, Boudreaux remained in a position of supervisor, and he continued to have the authority to recommend Plaintiff for a day shift until June 1, 2022. (Doc. 34-1 at 26–27; Doc. 34-4 at 25, 28–29.) In addition, Plaintiff claims that Coody later told her, in roughly October

of 2021, that "she should have moved [Boudreaux] the first time that [Plaintiff] had made a complaint with one—him or me to another lab[.]" (Doc. 34-2 at 34.) This did not happen.

Coody testified that Plaintiff did not bring up the conversation and text messages about sexual role playing and bondage until April or May of 2022, when she also expressed concerns about Boudreaux talking to her coworkers about her return to the office after taking medical leave. (Doc. 34-4 at 26.) At this point, Coody claims, Plaintiff brought up the conversation but not the text messages. (*Id.*) Despite her earlier statement that "he would have been fired, period[,]" (*id.* at 18), Coody merely "spoke to [Boudreaux,]" who denied it, (*id.* at 27.) Coody testified that if Plaintiff had told her about this "back in 2020 . . . [w]e would have conducted a further investigation at that point. That would probably [have] led to do you have evidence? Give me evidence." (*Id.* at 27.) Coody did not explain why she could not conduct a further investigation or ask for evidence in 2022. (*Id.*)

In her deposition, Coody acknowledged that Plaintiff "indicated that she had told" Coody about the incident in 2020. (*Id.*) Indeed, Coody was more concerned with Boudreaux speaking with a coworker about Plaintiff's return to work and the cause for her medical leave—as a result of his talking about Plaintiff after being instructed not to, he was suspended with pay for a week and removed from his supervisory position. (*Id.* at 28.) He was placed in a position that had not previously existed, with the same salary he had previously received, potentially lower bonus options, and fewer demands outside of his typical shift schedule. (*Id.* at 29–30. Boudreaux was not informed that he would not be allowed to return to a supervisor position. (*Id.* at 30.)

Although Boudreaux's alleged harassment may have stopped after March 2020, he remained in the same lab as Plaintiff, in a supervisory position, conducted performance reviews of Plaintiff, with easy access to Plaintiff. (Doc. 34-2 at 41.) Indeed, Plaintiff testified that he

repeatedly printed things to her printer, in her office. (*Id.* at 42.) This placed the onus for avoiding Boudreaux on Plaintiff. (*Id.* at 45–46.) Defendants' own HR manager acknowledges that, if Plaintiff had informed her about the conversation about sexual role play and bondage in March of 2020, the appropriate response would have been to investigate further, ask for evidence, and if she was shown the text messages Boudreaux sent to Plaintiff, then terminate Boudreaux. (Doc. 34-4 at 18.) There is a genuine dispute of material fact as to whether Plaintiff did, as she asserts, inform Coody about this conversation in March of 2020 or in the spring of 2022. Because there is a genuine dispute as to this fact, Defendants have not established that they "exercised reasonable care to prevent and promptly correct any sexual harassment[.]" *Wallace*, 57 F.4th at 217. Consequently, Defendants fail to establish an *Ellerth/Faragher* affirmative defense as to Plaintiff's hostile work environment claims.

### d.    Retaliation

In addition to her claims of discrimination, Plaintiff alleges that Boudreaux retaliated against her after she rejected his advances. (Doc. 1 at ¶ 87.) She asserts that he "intentionally ignored her requests for work assistance, . . . repeatedly refused to transition Plaintiff to a day-shift role . . ., and, when Plaintiff returned from an extended medical leave, purposefully discussed Plaintiff's confidential medical information and Plaintiff's allegations of sexual harassment against him with co-workers." (*Id.*) Defendants argue that Plaintiff cannot show that any of these constituted retaliation under Title VII.

Title VII "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 56 (alteration in original) (quoting 42 U.S.C. § 2000e-3(a));

*see Saketkoo*, 31 F.4th at 999. Where "a retaliation case is based on circumstantial evidence," courts "apply the *McDonnell Douglas* framework." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2007) (citing *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425, 427 (5th Cir. 2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under that framework, "[t]o establish a prima facie case of retaliation, an employee must show '(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.'" *Saketkoo*, 31 F.4th at 1000 (quoting *Brown*, 969 F.3d at 577) (cleaned up). "If the plaintiff establishes a prima facie case, then the employer has the burden of production to provide 'a legitimate, non-discriminatory reason' for the adverse employment action." *Brown*, 969 F.3d at 577 (quoting *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)). If the employer can establish a legitimate, non-discriminatory reason, the burden returns to the plaintiff "to prove that the proffered reason is pretextual." *Id.* "[T]he burden of persuasion remains with the employee throughout." *Saketkoo*, 31 F.4th at 1000.

Here, Plaintiff asserts that Defendants' failure to transfer her to the day shift was retaliation for her rejection of Boudreaux's advances. (Doc. 1 at ¶ 87.) While the Court draws all reasonable inferences in favor of the non-moving party at the summary judgment stage, the fact remains that rejecting a supervisor's advances—or even a supervisor's harassment—is not in itself protected activity. The Fifth Circuit has "interpreted Title VII's opposition clause to mean that a plaintiff engages in protected activity when she complains of an employment practice that she 'reasonably believes' violated Title VII." *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 619 (5th Cir. 2020) (quoting *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016)). Prior to her conversation with Coody on March 13, 2020, Plaintiff had not complained of Boudreaux's alleged harassment,

and she therefore cannot assert retaliation under Title VII prior to that complaint. (*See* Doc. 34-1 at 9.)

Plaintiff argues that within two weeks of her complaint to Coody of Boudreaux's harassment, another employee was given the day shift position Plaintiff sought. (Doc. 1 at ¶ 39.) As the Court has previously analyzed, the refusal to transfer Plaintiff to a day shift can reasonably be considered an adverse employment action under recent precedent. *See Muldrow*, 601 U.S. at 359–60; *Hamilton*, 79 F.4th at 505; *Wallace*, 57 F.4th at 218–19. "If an adverse employment action occurs within close temporal proximity to protected activity known to the employer, a plaintiff will have met her burden to establish a prima facie case of retaliation." *Badgerow*, 974 F.3d at 619 (citing *Garcia v. Professional Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)). Here, the two-week time period is sufficient to establish close temporal proximity. *See, e.g.*, *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a two-month period was sufficient to establish causation); *January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) (finding that a six-week period was sufficient to establish causation).

However, Defendants argue that they have a legitimate, non-discriminatory reason for promoting another employee rather than Plaintiff: the other employee was significantly more qualified. (Doc. 24-2 at 6.) She had a Ph.D., unlike any other employee in the lab. (*Id.*) Given Defendants' proffer of a legitimate, non-discriminatory reason, Plaintiff now again has the burden of proving that this is pretext. *See Badgerow*, 974 F.3d at 619. Plaintiff makes no arguments of pretext. Consequently, she has failed to carry her summary judgment burden with respect to this retaliation claim.

Plaintiff argues that Boudreaux again attempted to refuse to transfer her to a day shift the next time one was available. (Doc. 1 at ¶ 50.) However, Plaintiff was ultimately offered that day

shift position, and after returning from her medical leave, she took that day shift position. (Doc. 34-1 at 22, 24, 29.) Plaintiff is therefore unable to show an adverse employment action with respect to this day shift position. Plaintiff has failed to establish a prima facie case of retaliation sufficient to survive summary judgment on these claims.

Finally, Plaintiff alleges that Boudreaux retaliated against her by speaking to other employees about her medical information and her sexual harassment claims. "For purposes of Title VII's anti-retaliation provision, the Supreme Court has held that an adverse employment action is defined slightly more broadly than the term is defined in the employment discrimination context." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 826 (5th Cir. 2019) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67–68). "[A] plaintiff seeking to establish a retaliatory adverse employment action 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington*, 548 U.S. at 68).

The Fifth Circuit has articulated the standard as requiring that "courts 'look to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused a diminution in prestige or change in standing among co-workers.'" *Id.* at 827 (quoting *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016)) (cleaned up). Here, Plaintiff asserts that Boudreaux told another employee that Plaintiff was "out to get us all[]" and "[i]f she says anything about why she was out, then you should tell me because she will be in a lot of trouble." (Doc. 34-3 at 28.) In his deposition testimony, Boudreaux did not deny this but said he "[did]n't remember the exact words." (*Id.*) Boudreaux also acknowledged having conversations with two other Shintech employees prior to Plaintiff's return from medical leave about "[t]hings I heard before she went

out[.]" (*Id.* at 42.) Specifically, Boudreaux said that he had conversations with co-workers informing them that an operator had told Boudreaux "that [Plaintiff] said she didn't like working with me" and that she wanted another employee to be in Boudreaux's position instead. (*Id.*) Other employees testified that Boudreaux "was discussing some of her, I guess, some of her medical issues and things like that with the teammates," (Doc. 34-5 at 27); that "[s]ome members of the team . . . were openly sharing . . . how [Boudreaux] seemed a little bit uneasy with [Plaintiff]'s return[,]" (*id.*); that Boudreaux "had said she shouldn't discuss her leave[]" or "talk about her leave with other people[,]" (Doc. 34-6 at 17); and that Boudreaux said "if she talks about her leave to let him know, but she shouldn't be talking about it[,]" (*id.* at 18).

The majority of these comments are about Plaintiff's medical leave, which would fall under the ADA rather than Title VII. On the other hand, comments to co-workers that Plaintiff was out to get them could reasonably be understood to be about her sexual harassment complaints, which were protected under Title VII. Comments disparaging a co-worker for filing a sexual harassment claim could, feasibly, cause a "diminution in prestige or change in standing among co-workers." *See Welsh*, 941 F.3d at 827. That said, none of Plaintiff's co-workers recall the comment that she was "out to get" anyone. (*See* Doc. 34-5 at 27; Doc. 34-6 at 17–18.) Even if they could, a single comment about the Title VII protected activity would not be sufficient to establish a claim for retaliatory harassment. Finally, there is no allegation that any of these comments affected Plaintiff's "job title, grade, hours, salary, or benefits[.]" *See Welsh*, 941 F.3d at 827. Even under the broader definition of adverse employment action applicable to Title VII retaliation claims, Plaintiff's claims do not survive summary judgment.

Plaintiff also argues that Boudreaux created a "retaliatory hostile work environment." (Doc. 1 at ¶ 90; Doc. 34 at 33.) The Fifth Circuit has repeatedly declined to recognize a retaliatory

hostile work environment cause of action. *See Montgomery-Smith v. George*, 810 F. App'x 252, 258 (5th Cir. 2020); *Heath v. Bd. of Supervisors for the S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 741 n.5 (5th Cir. 2017); *Lemonia v. Westlake Mgmt. Servs.*, No. 22-30630, 2023 U.S. App. LEXIS 27717, at *22, 2023 WL 6878915, at *8 (5th Cir. Oct. 18, 2023).

Consequently, Plaintiff has failed to establish a prima facie case of retaliation under Title VII sufficient to survive summary judgment.

**B.    ADA Failure to Accommodate**

"To prevail on her failure-to-accommodate claim, [a plaintiff] must show that '(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Jennings*, 11 F.4th at 343 (quoting *Moss*, 851 F.3d at 417 (internal quotations omitted)).

**a.    Disability**

"[T]he relevant timeframe for assessing the existence of a disability is the time of the alleged adverse employment action[.]" *Julian v. DeJoy*, No. 23-11101, 2024 U.S. App. LEXIS 25304, at *12, 2024 WL 4433076, at *4 (5th Cir. Oct. 7, 2024) (citing *E.E.O.C.*, 570 F.3d at 618). "The ADA defines 'disability' as, with respect to an individual, 'a physical or mental impairment that substantially limits one or more major life activities of such individual.'" *Mueck*, 75 F.4th at 478 (quoting 42 U.S.C. § 12102(1)(A)). Notably, courts have recognized depression and other mental health conditions as disabilities. *Id.* at 479–80. Likewise, federal regulations accompanying the ADA state that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia

substantially limit brain function." 29 C.F.R. § 1630.2(j)(3)(iii). In addition, a "[p]hysical or mental impairment" includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1). "Major life activities include, but are not limited to: [] Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]" 29 C.F.R. § 1630.2(i)(1)(i).

However, "'[m]erely having an impairment' is not enough to qualify as disabled under the ADA—a plaintiff 'also needs to demonstrate that the impairment substantially limits a major life activity.'" *Mueck*, 75 F.4th at 479 (quoting *E.E.O.C.*, 570 F.3d at 614) (cleaned up). The Fifth Circuit has previously found that a plaintiff's affidavit testimony as to her inability to perform major life activities was "sufficient evidence to survive summary judgment." *E.E.O.C.*, 570 F.3d at 617.

Defendants argue that "Plaintiff cannot establish that she suffered from a disability at any point from August 2018 to October 2021[,]" (Doc. 24-2 at 31), and that she received accommodations in the form of "FMLA leave and long-term disability leave from October 8, 2021 until April 28, 2022[,]" (*id.* at 31 n.6). They argue that Plaintiff must show evidence of her alleged impairments during the relevant time frames. (*Id.* at 32.)

Plaintiff claims that she suffered from depression, migraines, and insomnia as a result of "[t]he unremedied harassment and the continued refusal to transfer Plaintiff to day shift[.]" (Doc. 1 at ¶ 48.) She signed a sworn affidavit attesting to these claims. (Doc. 1-2 at 1.) In her sworn

deposition testimony, Plaintiff described her history with narcolepsy, insomnia, depression, and headaches. (Doc. 34-2 at 31, 34, 49, 50, 52.) Plaintiff stated that she took Seroquel for her insomnia while on and after medical leave. (*Id.* at 53.) Plaintiff also presents a note from her doctor at the Louisiana Sleep Foundation dated February 1, 2022, attesting that she "should not work night shifts based on her medical history." (Doc. 34-18 at 4.) With respect to her sleep disorders, Plaintiff stated that shift work made her insomnia worse, prevented her from sleeping, and "had an effect on my mental health." (Doc. 34-2 at 50.) She stated that her insomnia and depression "made it almost impossible for me to fall asleep whether it was day or night[;]" "made it increasingly difficult[]" to concentrate; "made it very, very difficult[]" to think; "[m]ade it very difficult, much more than normal[]" to communicate. (*Id.* at 57.) Plaintiff stated that her "insomnia worsened everything." (*Id.*)

The Fifth Circuit has previously stated that "[e]very circuit that has addressed the issue has concluded that sleeping is a major life activity." *E.E.O.C.*, 570 F.3d at 616. It likewise concluded "that sleeping and thinking are major life activities[]" and "are certainly of central importance to daily life." *Id.* Plaintiff here has testified to her inability to sleep, concentrate, think, or communicate as a result of her insomnia. A reasonable jury could therefore find that Plaintiff was disabled during the relevant timeframe because she was substantially limited in the major life activity of sleeping as a result of her insomnia.

With respect to her depression, Plaintiff stated that her diagnosis with depression predated her job at Shintech. (*Id.* at 52.) She stated that prior to working at Shintech, she had taken medication for depression, then took Wellbutrin for a time while at Shintech before beginning to take Prozac while on medical leave. (*Id.*) Plaintiff provides a note from her psychiatrist stating that

her "work schedule [should] be moved to a day shift" because "[n]ight shifts interfered with [her] sleep routine, which worsened her depression." (Doc. 34-18 at 3.)

In addition, her psychiatrist stated that "[s]he will also need to arrange her Dr[.] appointments for her TMS treatment with your schedule." (*Id.*) TMS stands for transcranial magnetic stimulation, a treatment used for major depressive disorder. She also presents a form requesting accommodations, completed by her doctor, stating that she would continue to need "[i]ntermittent leave only for attending therapy appts, psychiatry appts & completing TMS on 4/27/22." (Doc. 34-21 at 3.) The same form, completed by her psychiatrist, notes that she "[n]eeds accommodations for attending doctor's appointments" and "[w]ould benefit from day working hours as sleep deprivation/nocturnal schedule would likely have negative impact on mood." (*Id.* at 8–9.)

Her therapist also completed the same form, stating that Plaintiff "needs to continue current therapy 1-2x per week. 2x per week would be most beneficial." (*Id.* at 13.) The therapist noted that Plaintiff "would also benefit from having a work day starting no earlier than 6 am" and that she should receive "leave when appointments with medical professionals is necessary." (*Id.*) Plaintiff stated in her deposition that because of her depression and insomnia, she was "struggling and not sleeping anymore and scared." (Doc. 34-2 at 34.) She stated that when her depression and insomnia were triggered, she slept less, struggled to think, concentrate, and communicate. (*Id.* at 58.)

Both federal courts and federal regulations have recognized depression as a disability that limits major life activities. *Mueck*, 75 F.4th at 479–80; 29 C.F.R. § 1630.2(j)(3)(iii). Plaintiff here has testified as to her struggles to sleep, think, concentrate, and communicate as a result of her depression. A reasonable jury could therefore find that Plaintiff was disabled during the relevant

timeframe because she was substantially limited in the major life activity of sleeping as a result of her depression.

With respect to her headaches, in her notes on her evaluation dated October 19, 2020, Plaintiff stated "I have had to use PPA for migraines. I believe adjusting to shift work has had an effect on the severity and frequency of these." (Doc. 34-15 at 5.) She also stated that she had "a new doctor and [was] trying new medication to improve this[,]" indicating an ongoing condition. (*Id.*) In her sworn deposition testimony, Plaintiff stated that her doctor first tentatively diagnosed her with migraines in March of 2020, although she did not receive a formal diagnosis. (Doc. 34-2 at 31, 55.) Plaintiff has not attested to any substantial limitations in major life activities as a result of her headaches, and she has therefore failed to establish a disability connected to her headaches.

### b.    *Known to Employer*

Plaintiff must also show that her disability and the limitations caused by it were known by her employer. *See Jennings*, 11 F.4th at 343 (quoting *Moss*, 851 F.3d at 417.) In her deposition, Plaintiff testified that she informed Coody in September of 2021 that her "insomnia was getting worse," and when Coody "asked [her] if [she] had conveyed this to [Boudreaux]," she said "yes, numerous times[.]" (Doc. 34-2 at 34; *see* Doc. 34-1 at 22–23.) Plaintiff states that Coody then said "well, then he dropped the ball. He should have come to me immediately[.]" (Doc. 34-2 at 34.) Boudreaux, in his deposition, claimed that he had relayed a statement from Plaintiff that "some of her illnesses is due to her having issues with shift work[]" to "someone in that staff" at HR. (Doc. 34-3 at 25.) He could not recall submitting anything in writing, he could not recall when he relayed the information to HR, but he did recall that it was either via phone calls or one-on-one conversations with someone on HR. (*Id.*) Both Plaintiff and Boudreaux have acknowledged that

41

Plaintiff informed her supervisor of her disabilities, and a reasonable jury could find that Plaintiff had informed him of the limitations her disabilities posed to performing certain shift work.

### c.    *Reasonable Accommodations*

Defendants argue that, despite knowing of Plaintiff's disabilities and the limitations they posed, Shintech was under no obligation to offer accommodations that were not directly requested by Plaintiff. (Doc. 24-2 at 35–37.) In her deposition, Plaintiff acknowledges that her failure to accommodate claim is not that Boudreaux "should have moved [her] to day shift earlier[.]" (Doc. 34-2 at 50.) Instead, she says that Boudreaux "as my supervisor when I went to him about those things multiple times, he should have said, hey, I'm going to talk to [Coody] about this. We're going to see what accommodations can be done." (*Id.*) Defendants argue that when Plaintiff requested these accommodations from Coody, she was allowed to go on medical leave on October 8, 2021, and given a day shift position that was held for her upon her return. (Doc. 24-2 at 10.) When asked what accommodations she was asking for prior to her meeting with Coody in September of 2021, Plaintiff said "I don't know, but I needed help, and that's what I was asking for." (Doc. 34-2 at 50.)

"As a threshold matter, the employee who 'needs an accommodation because of a disability has the responsibility of informing [his or her] employer.'" *Mueck*, 75 F.4th at 486 (quoting *Chevron Phillips*, 570 F.3d at 621). "Failure to request an accommodation, particularly where an employee's disability is not obvious, will doom a claim." *Id.* (citing *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020)). "In making this request, 'special words, like "reasonable accommodation," need not be uttered, but the employee must explain that the proposed adjustment in working conditions is for a medical condition-related reason.'" *Id.* (quoting *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476 (5th Cir. 2016)) (cleaned up). However, once a "qualified

individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 468–69 (5th Cir. 2021) (quoting *E.E.O.C. v. Agro Distrib., L.L.C.*, 555 F.3d 462, 471 (5th Cir. 2009)).

Although Plaintiff had the responsibility to initiate a request for an accommodation, neither she nor Boudreaux disputes that she did inform him of her worsening health concerns as a result of shift work. (Doc. 34-3 at 24–25.) Plaintiff asserts, and Boudreaux does not dispute, that Plaintiff requested help as a result of this. (Doc. 34-2 at 50.) Plaintiff may not have uttered the magic words of "reasonable accommodation," and she may not have requested any specific remedy from Boudreaux, but she attests, and he does not dispute, that she requested help in performing her job due to her disability. (*Id*.) Boudreaux claims that he informed HR of Plaintiff's disabilities, although there remains a question as to whether he informed them of her requests for help. (Doc. 34-3 at 25.) A reasonable jury could therefore find that Plaintiff had made a request for a reasonable accommodation from her employer, who knew of her disability. At this stage, Shintech would have the responsibility to engage in interactive discussions to determine an appropriate accommodation. They did not do this until Plaintiff raised concerns about her health to Coody directly in September of 2021. (Doc. 34-1 at 22–23.)

Defendants note that when Boudreaux asked Plaintiff, in a series of texts about Plaintiff's bout with shingles and personal stressors, if there was anything he could do to help, Plaintiff said no. (Doc. 24-2 at 36; *see* Doc. 34-2 at 21.) Defendants repeatedly rely on the fact that Plaintiff stated "it will be OK" with respect to her shingles. (Doc. 24-2 at 35; Doc. 37 at 20.) Notably, Plaintiff does not allege that Defendants failed to provide her with reasonable accommodations for her shingles. (Doc. 1 at ¶¶ 145–59.) This conversation is therefore irrelevant.

Likewise, Defendants reference an email chain in which they claim Plaintiff informed Boudreaux that it was difficult for her to do shift work, but when he asked if there was anything he could do, she replied no. (Doc. 24-2 at 37.) Defendants do not provide the emails referenced, so the Court does not know what disabilities Plaintiff referenced in these emails, when these emails occurred, or the context of the emails. A reasonable jury could therefore conclude these emails were about Plaintiff's shingles or her migraines, or that they took place in a personal rather than professional capacity. Given Plaintiff's claims as to the nature of Boudreaux's relationship with her, as well as his admitted interactions with her, a reasonable jury could conclude that Boudreaux's offers to help her were of a personal, rather than professional, nature.

Upon receiving a request from Plaintiff for accommodations, Boudreaux—as her supervisor—was under an obligation to initiate professional interactive discussions to determine an appropriate accommodation. This should have been conducted through Shintech's official channels—not through unofficial offers of help from Boudreaux, which Plaintiff could have interpreted as continued sexual harassment. Plaintiff has therefore established genuine questions of material fact sufficient to survive summary judgment with respect to her ADA failure-to-accommodate claim.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 24) filed by Defendants Shintech Louisiana, LLC and Shintech, Inc. is **GRANTED IN PART** and **DENIED IN PART**. Defendants' *Motion for Summary Judgment* is granted with respect to Plaintiff's Title VII claim for constructive discharge; Plaintiff's Title VII claim for quid pro quo discrimination; and Plaintiff's Title VII claims for retaliation, retaliatory hostile work environment, and retaliatory

constructive discharge. However, Defendants' *Motion for Summary Judgment* is denied with respect to Plaintiff's Title VII claim for hostile work environment and Americans with Disabilities Act claim for failure to accommodate.

Signed in Baton Rouge, Louisiana, on <u>March 26, 2025</u>.

 

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**